UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ELIZABETH M. LUCAS,

        Plaintiff,

   v.                               Case No. 20-C-799

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

        Defendant.

---

## DECISION AND ORDER AFFIRMING THE DECISION OF THE COMMISSIONER

---

Plaintiff Elizabeth Lucas filed this action for judicial review of a decision of the Commissioner of Social Security denying her application for disability insurance benefits and supplemental social security income under Titles II and XVI of the Social Security Act. Lucas asserts that the decision of the administrative law judge (ALJ) is flawed and requires reversal for a number of reasons. For the reasons that follow, the Commissioner's decision will be affirmed.

## BACKGROUND

Lucas filed her application for disability insurance benefits on May 23, 2014, alleging disability beginning on that same date, when she was 23 years old. R. 316. She listed connective tissue disease/lupus, CMV, asthma, depression, and anxiety as the conditions limiting her ability to work. R. 320. After her application was denied initially and on reconsideration, she requested a hearing before an ALJ. ALJ Guila Parker conducted a hearing on March 2, 2017. Lucas, who was represented by counsel, a doctor, and a vocational expert (VE) testified. R. 41–92. In a written decision dated May 31, 2017, the ALJ found Lucas was not disabled. R. 16–39. The Appeals Council denied Lucas' request for review of the ALJ's decision, making the decision the final

decision of the Commissioner. Lucas subsequently filed a complaint in the United States District Court for the Eastern District of Wisconsin seeking judicial review of the ALJ's decision. The matter was reversed and remanded for further proceedings based upon a stipulation of the parties. *See* R. 1249–55; *Lucas v. Berryhill*, No. 18-C-1196 (E.D. Wis.). Upon remand, her disability insurance benefits claim was consolidated with her supplemental security income claim, which she filed in November 2018. R. 1275.

ALJ Guila Parker held a second administrative hearing on December 10, 2019. R. 1166–1218. Lucas, who was again represented by counsel, and a VE testified. At the time of this hearing, Lucas was 30 years old and lived in a basement flat with her three children. R. 1171–72. She testified that she had a GED. R. 1171. She indicated that she had previously worked as a cashier and then was self-employed as a home aide assistant after she was fired from the cashier job. R. 1173–75. Lucas testified that she stopped the home aide job because she started getting sick after the birth of her second child. R. 1175.

When asked about her physical tolerances, Lucas testified that she has pain, weakness, and numbness in her hands and legs that significantly limit her functional capacity. R. 1178. She stated that she lifted at most a gallon of milk on a daily basis. R. 1179. Lucas stated that her connective tissue disorder has also led to a condition called iritis, which causes sensitivity to light and results in headaches and the need to wear sunglasses. R. 1183. She sees a doctor once or twice a month for pain and a therapist weekly to help her deal with stress. R. 1182–83. She confirmed that she still has asthma and stomach problems. R. 1190. She takes Tylenol and gabapentin most days along with other medications that "loosen" her up enough that she can do some chores. R. 1192. Her mother and children's father help her with her children, especially getting them to and from school. R. 1193–94. She testified that on bad days, when she stays in bed, her eldest child makes sure the younger ones are fed. R. 1194.

In a twenty-page decision dated January 28, 2020, the ALJ concluded that Lucas was not disabled. R. 1021–40. Following the Social Security Administration's (SSA) five step sequential evaluation process, the ALJ found that Lucas had not engaged in any substantial gainful activity since May 23, 2014, her alleged onset date. R. 1023. The ALJ noted that Lucas' earnings record indicates that she has not had any reported income since 2012 but reported that she continued working as a self-employed housekeeper through her alleged onset date of disability. The ALJ determined that Lucas had the following severe impairments: lupus vs. mixed connective tissue disease, fibromyalgia, asthma, deQuervain's tenosynovitis, obesity, affective disorder, anxiety, post-traumatic stress disorder (PTSD), and alcohol and drug abuse. R. 1023–24. The ALJ concluded that Lucas did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 1024. The ALJ then assessed Lucas' RFC, finding that:

> the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant should never climb ladders, ropes, or scaffolds. The claimant should never work at unprotected heights or around dangerous moving machinery. The claimant should avoid concentrated exposure to extreme heat or cold and to humidity or wetness. The claimant should avoid concentrated exposure to fumes, dusts, odors, gases, or similar pulmonary irritants. The claimant is frequently able to handle and finger with the upper right extremity. The claimant is able to understand, remember, and carry out simple instructions that carry a reasoning development level no greater than 03. The claimant can maintain concentration, persistence, and pace for two-hour intervals over an 8-hour day with routine breaks. The claimant can tolerate occasional changes in work setting. The claimant can perform work that does not impose fast-paced production quotas. The claimant is occasionally able to interact with the public. This claimant is occasionally able to interact with supervisors and co-workers, but should not be required to perform tandem tasks that require coordination with co-workers.

R. 1027. The ALJ determined that Lucas had never engaged in any past relevant work. The ALJ nevertheless concluded that, when considering her age, education, work experience, and RFC, jobs exist in significant numbers in the national economy that she could perform, including

merchandise marker, collator operator, and router.  R. 1039–40.  Accordingly, the ALJ found that, under 20 C.F.R. § 416.920(g), Lucas had not been disabled since May 23, 2014.  R. 1040.

## LEGAL STANDARD

The burden of proof in social security disability cases is on the claimant.  20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled.").  While a limited burden of demonstrating that other jobs exist in significant numbers in the national economy that the claimant can perform shifts to the SSA at the fifth step in the sequential process, the overall burden remains with the claimant.  20 C.F.R. § 404.1512(f).  This only makes sense, given the fact that the vast majority of people under retirement age are capable of performing the essential functions required for some subset of the myriad of jobs that exist in the national economy.  It also makes sense because, for many physical and mental impairments, objective evidence cannot distinguish those that render a person incapable of full-time work from those that make such employment merely more difficult.  Finally, placing the burden of proof on the claimant makes sense because many people may be inclined to seek the benefits that come with a finding of disability when better paying and somewhat attractive employment is not readily available.

The determination of whether a claimant has met this burden is entrusted to the Commissioner of Social Security.  Judicial review of the decisions of the Commissioner, like judicial review of all administrative agencies, is intended to be deferential.  *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).  The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  But the "substantial evidence" test is not intended to reverse the burden of proof.  In other words, a finding that the claimant is not disabled can also follow from a lack of convincing evidence.

4

Nor does the test require that the Commissioner cite conclusive evidence excluding any possibility that the claimant is unable to work. Such evidence, in the vast majority of cases that go to hearing, is seldom, if ever, available. Instead, the substantial evidence test is intended to ensure that the Commissioner's decision has a reasonable evidentiary basis. *Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).").

The Supreme Court recently reaffirmed that, "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229). It means—and means only—"'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*

The ALJ must provide a "logical bridge" between the evidence and his or her conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). But it is not the job of a reviewing court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Lopez ex rel. Lopez v.*

5

*Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).  Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination.  Failure to do so, unless the error is harmless, requires reversal.  *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006).  Finally, judicial review is limited to the rationales offered by the ALJ.  *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. Assessment of Medical Opinions

Lucas contends that the ALJ erred in evaluating the opinions of her primary care provider, Dr. Nikki Allen.  Generally, the ALJ must give "controlling weight" to the medical opinions of a treating physician on the nature and severity of an impairment if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with other substantial evidence."  *Burmester*, 920 F.3d at 512; *see also* 20 C.F.R. § 416.927(c).  If the ALJ decides to give lesser weight to a treating physician's opinion, he must articulate "good reasons" for doing so.  *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010).  Stated differently, although an ALJ is not required to give the treating physician's opinion controlling weight, he must provide a "sound explanation for his decision to reject it."  *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).  "If the ALJ does not give the treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and

6

the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

The reason for the treating physician rule is that a claimant's treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). On the other hand, a treating physician can be subject to certain biases that are less likely to bear on other medical sources. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). "The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985). In addition, the Seventh Circuit has recognized that "the claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise." *Dixon*, 270 F.3d at 1177. In any event, when the opinion of a treating physician is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence it is controlling.

Dr. Allen wrote a letter in July 2015 stating that she had been Lucas' family physician for four years and supported Lucas' attempts to obtain disability benefits for "significant mental health issues complicated by chronic connective tissue problems causing pain." R. 812. She focused primarily on Lucas' mental health issues which, in Dr. Allen's view, "on their own, merit her disability." *Id.* Dr. Allen opined that Lucas had severe depression and intolerance of things not going her own way, that she gets angry easily and is prone to swearing and yelling, and that she does not respond well to rules or expectations placed on her by others. In Dr. Allen's opinion,

7

"any employer would not tolerate her behavior and outbursts." *Id.* Dr. Allen "strongly" believed that Lucas "needs disability." *Id.*

In January 2016, Dr. Allen completed a Mental Health Report in which she checked a series of boxes indicating that Lucas has moderate restrictions of activities of daily living; extreme difficulties in maintaining social functioning; constant deficiencies of concentration, persistence, or pace resulting in her failure to complete tasks in a timely manner; and repeated episodes of deterioration or decompensation in work or work-life settings which cause her to withdraw from that situation or to experience exacerbation of signs and symptoms. R. 1011. She indicated that Lucas would miss work more than three times a month due to her impairments. *Id.* Dr. Allen checked boxes indicating that Lucas had poor to no ability to perform most work tasks. R. 1012.

At the 2017 hearing, Dr. Allen testified that Lucas could not hold a full-time job because "she has a complex combination of both mental and physical issues." R. 1084–85. In an October 2018 treatment note, Dr. Allen stated, "It is still, as it has been, my medical opinion that she is disabled to the point of being incapable of maintaining employment." R. 1857. She noted that she based her opinion on the longitudinal relationship she has with Lucas, her mood swings and difficulty interacting with others, her periods of severe depression, her anger outburst, and her physical pain and recurrent exacerbations of auto-immune issues. *Id.* The following month, Dr. Allen indicated in a treatment note that Lucas was unable to work. R. 1902.

Dr. Allen completed a Physical Residual Functional Capacity Questionnaire for Lucas' attorney in November 2019. R. 2144–48. She indicated that Lucas' psychiatric issues are the most disabling. R. 2145. Dr. Allen opined that Lucas would be off task 25% or more of the workday and that she was incapable of even low stress jobs because she is easily angered and does not interact well with others. She noted that Lucas can walk less than one city block without rest or severe pain, can sit for one hour at one time, can stand for ten minutes at one time before needing

8

to sit down or walk around, can stand or walk for less than two hours in an eight-hour workday, can sit for about two hours in an eight-hour workday, and would need to walk around every ten minutes for five to ten minutes during an eight-hour workday. R. 2145–46. Dr. Allen stated that Lucas would need a job that permits shifting at will from sitting, standing, or walking; that she would need to take unscheduled breaks every hour for 10 to 20 minutes; and that she would need to elevate her legs at hip level for about one to two hours. R. 2146. She checked boxes indicating that Lucas can rarely lift 10 pounds or less; never lift 20 or 50 pounds; occasionally look down, turn her head right or left, look up, and hold her head in a static position; rarely twist; and never stoop, crouch/squat, climb ladders, and climb stairs. R. 2146–47. Dr. Allen indicated that Lucas had significant limitations with reaching, handling, or fingering and that she could use her hands to grasp, turn, and twist objects 10% of the workday; use her fingers for fine manipulation for 10% of the workday; and never use her arms for reaching. R. 2147. She opined that Lucas would be absent from work for more than four days per months as a result of her impairments or treatment. *Id.*

The ALJ gave Dr. Allen's opinions little weight. She explained that, while the overall evidence supports a finding that Lucas experiences limitations due to her physical impairments, it does not support the degree assessed by Dr. Allen. She reasoned that Dr. Allen indicated in September and November 2019 that Lucas' primary reason for disability was psychiatric issues, with physical issues contributing. The ALJ also noted that Dr. Allen's opinions as to Lucas' physical limitations are not consistent with Lucas' largely mild clinical findings (e.g., intact range of motion, strength, coordination, and gait); her reported improvement in symptoms with treatment; her February 2019 report that she is able to sit for six hours per day, sweep floors and clean the toilet, and regularly attend appointments; or her April 2019 report that she was

9

independent in her daily activities and home mobility. The ALJ stated that these factors detract from Dr. Allen's speculation as to Lucas' likely work absences. R. 1035.

As to Dr. Allen's opinions about Lucas' mental capacity, the ALJ gave those opinions little weight because they are "largely conclusory." R. 1036. She also observed that Dr. Allen is a general practitioner, not a psychiatrist, and her assessment of mental functioning is less persuasive for the absence of specific subject matter expertise. As an example, the ALJ noted that July 2015 correspondence from Dr. Allen references Lucas' chronic connective tissue problems, provides observations regarding her mental health issues, and states her belief that Lucas needs disability. It was not improper for the ALJ to note that Dr. Allen was a general practitioner rather than a mental health specialist. *See* 20 C.F.R. § 416.927(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than the medical opinion of a source who is not a specialist.").

The ALJ also found that that opinion lacked a function-by-function analysis and addressed a determination reserved for the Commissioner. She indicated that the statement in Dr. Allen's October and November 2018 treatment notes that Lucas is unable to work is also a conclusion on an issue reserved for the Commissioner. *Id.* The regulations reserve to the Commissioner "the *final* responsibility for deciding residual functional capacity (ability to work—and so whether the applicant is disabled)." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (citing 20 C.F.R. § 404.1527(e)(2)). While the fact that a treating physician intrudes on an issue reserved to the Commissioner is not a reason to disregard the opinion entirely, the ALJ concluded that Dr. Allen's opinions were largely conclusory. While Lucas argues that the ALJ cherry-picked evidence from the record, substantial evidence supports the ALJ's determination that Dr. Allen's extreme limitations were inconsistent with the evidence in the record, including Lucas' reports and Dr. Allen's treatment notes. Lucas' disagreement with the ALJ's findings is not a basis for remand.

10

The ALJ thoroughly reviewed the record and provided an "accurate and logical bridge" between the evidence and her conclusions. *Roddy*, 705 F.3d at 636. In sum, the ALJ did not err in not giving controlling weight to Dr. Allen's opinions.

## B. Evaluation of Subjective Symptoms

Lucas also contends that the ALJ erred in evaluating her subjective symptoms. The Social Security regulations set forth a two-step procedure for evaluating a claimant's statements about the symptoms allegedly caused by her impairments. *See* 20 C.F.R. § 404.1529. First, the ALJ determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." § 404.1529(a). If so, the ALJ then "evaluate[s] the intensity and persistence" of a claimant's symptoms and determines how they limit the claimant's "capacity for work." § 404.1529(c). In doing so, the ALJ considers all the available evidence as well as the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of her pain or other symptoms; (3) the precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) other treatment; and (6) any other factors concerning functional limitations and restrictions due to pain or other symptoms. *See* § 404.1529(c)(3); *see also* SSR 16-3p. "ALJ credibility determinations are given deference because ALJs are in a special position to hear, see, and assess witnesses." *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014) (citation omitted). On judicial review, the court must "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). The court is not to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner." *Lopez*, 336 F.3d at 539. "It is only when the ALJ's determination lacks any explanation or support

11

that we will declare it to be patently wrong . . . and deserving of reversal." *Elder*, 529 F.3d at 413–14 (internal quotation marks and citations omitted); *see also Burmester*, 920 F.3d at 510.

Lucas argues that the ALJ used improper boilerplate language in making her credibility determination.  The Seventh Circuit has recognized that "[t]he fact that the 'ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Burmester*, 920 F.3d at 510 (quoting *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2018)).  The ALJ's use of boilerplate language in this case was not problematic because the ALJ discussed the substantial evidence that supports her decision.

Lucas then suggests that the ALJ improperly relied on the objective medical evidence when evaluating her symptoms.  But the ALJ's discussion of the medical evidence in relation to Lucas' alleged symptoms complied with the SSA's regulations and rulings.  Though an ALJ may not reject a claimant's statements about the intensity and persistence of her pain or other symptoms or about the effect her symptoms have on her ability to work "solely because the available objective evidence does not substantiate [her] statements," 29 C.F.R. § 404.1529(c)(2), this does not mean an ALJ cannot consider the medical evidence in assessing a claimant's credibility.  Objective medical evidence is a "useful indicator to assist us in making reasonable conclusions about the intensity and persistence of [a claimant's] symptoms and the effect those symptoms, such as pain, may have on [the claimant's] ability to work." *Id.*  In this case, the ALJ determined that Lucas had severe impairments but that she is not as limited as she alleges.  The ALJ appropriately based that determination on the longitudinal records of her ongoing medical evaluations, Lucas' treatment, her statements, her reported activities, the medical opinions, and the other evidence in the record.  R. 1027–38.

Lucas argues that the ALJ improperly evaluated her activities of daily living. While an ALJ must consider the claimant's daily activities as one factor in evaluating intensity and persistence of pain, "this must be done with care." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). An ALJ cannot place "undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Mendez v. Barnhart*, 439 F.3d 360, 362–63 (7th Cir. 2006). In this case, the ALJ did not equate Lucas' ability to perform certain activities of daily living with an ability to work full time. Instead, she used Lucas' reported activities to assess the credibility of her statements concerning the intensity, persistence, and limiting effects of her symptoms. *See Pepper*, 712 F.3d at 369 ("The ALJ concluded that, taken together, the amount of daily activities Pepper performed, the level of exertion necessary to engage in those types of activities, and the numerous notations in Pepper's medical records regarding her ability to engage in activities of daily living undermined Pepper's credibility when describing her subjective complaints of disability and pain.").

The ALJ properly relied on Lucas' admitted activities to assess her statements concerning the intensity, persistence, and limiting effects of her impairments. The ALJ noted that Lucas acknowledged tending to her personal care without assistance or reminders; caring for her young children; preparing simple meals; tending to household chores; driving a vehicle; regularly attending church; shopping in stores as necessary; and spending time reading and watching television. R. 1034. Although Lucas maintains that the ALJ did not consider the fact that friends and family helped her to complete these activities, the ALJ did indicate that Lucas receives assistance at times from friends and/or family. *Id.*

Lucas further argues that the ALJ failed to account for her use of prescribed medications and their side effects. For instance, Lucas asserts that she testified that her medications caused drowsiness, headaches, nausea, constipation, and dizziness. "Some of the factors that the ALJ

13

considers at this stage are 'the type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms.'" *Arnold v. Saul*, 990 F.3d 1046, 1047 (7th Cir. 2021) (quoting § 404.1529(c)(3)(iv)). The ALJ was not required to make specific findings about Lucas' side effects in this case. Although Lucas maintains that she complained about certain side effects, she does not explain how the side effects impacted her ability to work. *See id.* ("Nothing in the record suggests that Arnold suffered side effects that actually impacted her ability to work."). In short, remand is not warranted on this basis.

Lucas maintains that the ALJ exaggerated the evidence or cherry-picked evidence. In this case, the ALJ accepted that Lucas had both physical and mental impairments but fully explained how the evidence contradicted the severity of her alleged symptoms. The ALJ thoroughly discussed Lucas' years of treatment and examinations and cited specific evidence in the record supporting her determination. Lucas' challenges to the ALJ's decision essentially ask the Court to reweigh the evidence and overrule the ALJ's opinion. This is not the Court's role, however. Judicial review is intended to be deferential, and the final decision of the Commissioner will be upheld if the ALJ applies the correct legal standards and supports her decision with substantial evidence. 42 U.S.C. § 405. The ALJ's conclusion is supported by substantial evidence, is not patently wrong, and does not necessitate remand.

## C. Concentration, Persistence, and Pace Limitations

Lucas asserts that the ALJ erred in assessing her RFC and in formulating the hypothetical question posed to the VE. In particular, Lucas claims that the ALJ failed to incorporate her limitations in the broad functional areas of concentration, persistence, and pace (CPP) into the RFC and hypothetical question. "As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). A claimant's RFC is "the most [the

14

claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). The responsibility for assessing a claimant's RFC in a case that proceeds to a hearing lies with the ALJ. 20 C.F.R. § 404.1546(c). The assessment of a claimant's RFC is based on "all the relevant medical and other evidence." 20 C.F.R. § 404.1554(a)(3).

Lucas maintains that the ALJ's RFC assessment was improper because it did not include all of the state agency reviewing psychologists' findings related to Lucas' CPP limitations. The state agency reviewing psychologists completed mental residual functional capacity assessments (MRFC) based on their review of the record. The MRFC is a form the agency uses to document its assessment of a claimant's mental RFC. The form lists a series of questions intended to address the claimant's ability to perform various work activities. For each functional area, the reviewing psychologist is asked if the individual has any limitations. Follow-up questions then ask the reviewer to rate the individual's limitations as to various activities within that functional area. The Social Security Administration's Program Operations Manual (POMS) lists the ratings to be used and what they are intended to mean. The ratings are "not significantly limited," which means "the effects of the mental disorder do not prevent the individual from consistently and usefully performing activity;" "moderately limited," which means "the individual's capacity to perform the activity is impaired;" and "markedly limited," which means "the individual cannot usefully perform or sustain the activity." POMS DI 24510.063, SOCIAL SECURITY, *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510063 (last visited Sept. 29, 2021). The reviewer can also indicate that there is no allegation of a limitation or that the evidence is insufficient. When the activity is rated "moderately limited," the degree and extent of the capacity or limitation must be described in narrative form in another section of the MRFC. *Id.*

Dr. Deborah Pape completed the MRFC on October 9, 2014. R. 160–62. She indicated that, with respect to Lucas' understanding and memory limitations, Lucas was moderately limited

in the ability to understand and remember detailed instructions. R. 160. As to Lucas' sustained concentration and persistence limitations, Dr. Pape found that Plaintiff was moderately limited in the ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 160–61. With respect to Lucas' limitations in social interaction, Dr. Pape indicated that Lucas was moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers and peers without distracting them or exhibiting behavioral extremes, and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. *Id.* As to Lucas' adaptation limitations, Dr. Pape opined that Lucas was moderately limited in her ability to respond appropriately to changes in the work setting. R. 161–62. In the narrative portion of each section, Dr. Pape merely commented that Lucas' diagnosis of depression and anxiety and history of alcohol and THC abuse supports moderate limitations with understanding and memory, moderate limits with CPP, moderate limits with social interaction, and moderate limits with adapting to change. R. 160–62. Dr. Pape provided the following narrative description of Lucas' RFC: "Overall file evidence supports [claimant's] mental health impairments are more than not severe however able to do simple routine work." R. 162. At the reconsideration level, Dr. Robert Starace completed an MRFC on April 9, 2015, and affirmed Dr. Pape's prior determination as written. R. 179–81.

The ALJ gave great weight to the state agency psychologists' opinions. R. 1036. After summarizing the checkbox portions of the state agency psychologists' checkbox forms, the ALJ found that their opinions are consistent with the overall evidence and appropriately balance Lucas' subjective reports and intermittent abnormalities in mood and affect with her otherwise

16

unremarkable mental status examinations (e.g., normal appearance, behavior, judgment, memory, attention, thought content), routine and conservative mental health treatment, documented improvement with treatment compliance (e.g., stability in mood and anxiety with medication) and reported activities, which have included tending to her personal care, caring for her young children, driving, handling money, and regularly attending church. *Id.* The ALJ ultimately concluded that Lucas had the following mental capacity limitations: "The claimant is able to understand, remember, and carry out simple instructions that carry a reasoning development level no greater than 03. The claimant can maintain concentration, persistence, and pace for two-hour intervals over an 8-hour day with routine breaks. The claimant can tolerate occasional changes in work setting. The claimant can perform work that does not impose fast-paced production quotas. The claimant is occasionally able to interact with the public. This claimant is occasionally able to interact with supervisors and co-workers, but should not be required to perform tandem tasks that require coordination with co-workers." R. 1027.

Lucas asserts that the ALJ erred by limiting her to simple, routine tasks because the Seventh Circuit has held that limiting a claimant to simple, repetitive tasks or unskilled work does not adequately capture moderate limitations in CPP. But Plaintiff ignores the other portions of the ALJ's RFC assessment which addresses her ability to concentrate, persist, and maintain pace. The state agency consultants checked boxes in the MRFC forms they completed that Lucas would be "moderately limited" in certain areas, and Lucas asserts that the ALJ erred by failing to account for these limitations in the RFC. But there is no requirement that the ALJ's RFC assessment track verbatim the medical opinions the ALJ considers. The ALJ gave "great weight" to the opinions of the state agency consultants; she did not adopt them wholesale. The Seventh Circuit has emphasized that "the law does not require ALJs to use certain words, or refrain from using others, to describe the pace at which a claimant is able to work." *Martin v. Saul*, 950 F.3d 369, 374 (7th

17

Cir. 2020). The same is true of the other functional areas. "As a matter of form, the ALJ need not put the questions to the VE in specific terms—there is no magic words requirement. As a matter of substance, however, the ALJ must ensure that the VE is 'apprised fully of the claimant's limitations' so that the VE can exclude those jobs that the claimant would be unable to perform." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) (quoting *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018); *DeCamp*, 916 F.3d at 675–76). In this case, the ALJ reasonably accounted for Lucas' CPP limitations in the RFC and hypothetical question posed to the VE. Substantial evidence supports her assessment.

### D. VE Testimony

Lucas asserts that the ALJ failed to elicit a reasoned and principled explanation of the VE's job estimates before relying on the VE's testimony to support the step five denial. At step five of the sequential evaluation process, the Commissioner has the burden of demonstrating the existence of a significant number of jobs in the national economy that a plaintiff can perform. *See* 20 C.F.R. §§ 404.1560(c)(1); 416.960(c)(1). The Seventh Circuit has held that, in assessing a VE's testimony concerning the number of jobs available in the national economy that a claimant can perform, "the substantial evidence standard requires the ALJ to ensure that the approximation is a product of a reliable method." *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018) (citation omitted). Lucas asserts that the ALJ failed to assess the reliability of the methodology the VE used in this case.

At the administrative hearing, the ALJ asked the VE whether there were any jobs in the national economy that a person with Lucas' age, education, work experience, and RFC could perform. The VE responded that there were and listed three categories of jobs: merchandise marker, of which there were 300,000 jobs in the national economy; collator operator, of which

there were 13,000 jobs in the national economy; and router, of which there were 50,000 jobs in the national economy. R. 1202.

Lucas' attorney asked the VE what her source for the job numbers was. R. 1207. The VE indicated that she uses SkillTRAN. She testified that she did not personally conduct studies or surveys to verify SkillTRAN numbers. *Id.* When Lucas' attorney asked the VE if she could identify one employer in the state of Wisconsin where the job exists, the ALJ noted that that is not the proper standard. R. 1207–08. The VE then clarified that, because she is not a statistician and had not conducted her own surveys, she relies on SkillTRAN for the job numbers. R. 1209. She noted that SkillTRAN's methodology for determining the job numbers are available online and briefly summarized the methodology for the attorney. R. 1211–12. Specifically, the VE testified that the core data source is the Bureau of Labor Statistics (BLS), that SkillTRAN also uses the current population survey, and that it conducts a rate of change. R. 1212. The ALJ noted that SkillTRAN is something most VEs identify as a source and that it is "pretty accepted." *Id.* When Lucas' attorney continued to question the validity of the job estimate numbers for the marker position, the ALJ noted the objection and advised that she would address the objection in the decision. R. 1216. The VE then testified that she relied on her education and experience and that her testimony was consistent with the Dictionary of Occupational Titles (DOT). R. 1216–17.

In her written decision, the ALJ overruled Lucas' objection to the VE's job number estimates. The ALJ explained:

> First, Attorney Tarlok cites to the Bureau of Labor Statistics data for challenging the demands of the jobs provided as outside the parameters of the residual functional capacity finding, specifically in terms of social interaction and skill level. However, Attorney Tarlok confuses the argument by citing incorrect DOT numbers for the jobs provided by the vocational expert (offering the DOT for an addressing clerk as the DOT for "marker"; and the DOT for no job as the DOT for "router"). Further, the undersigned finds the vocational expert, Ms. Armstrong, is qualified to identify existing jobs and provide job numbers based upon her education and experience, per her testimony and resume in the file (Exh. B23E). The Agency has certified Ms.

19

Armstrong as qualified to testify at Agency hearings regarding vocational information, and Ms. Armstrong has provided a persuasive description of her methodology, which includes reliance on her professional experience, education, and resources. While Attorney Tarlok points out that Ms. Armstrong was unable to explain the underlying methods used by SkillTran to arrive at job numbers, Ms. Armstrong is not a statistician and may rely on SkillTran without explaining its underlying methodology. Finally, the claimant's representative does not cite to a reviewing tribunal that has found Ms. Armstrong's professional qualifications or her overall methodology to be wanting. Accordingly, the vocational expert's job information is found to be reliable.

R. 1039–40.

Lucas criticizes the VE's "suspiciously round" job estimate numbers. Pl.'s Br. at 8, Dkt. No. 21 (quoting *Forsythe v. Colvin*, 813 F.3d 677, 680 (7th Cir. 2016)). In *Forsythe*, the court observed that the ALJ's job estimate numbers of 1,000 production worker jobs, 1,000 information clerk jobs, and 2,000 cashier jobs "sound like guesses." 813 F.3d at 680. The court did not find that the VE erred in providing rounded job estimates. Instead, the court found that the VE's methodology was flawed because the VE failed to define the jobs in question or provide examples of jobs he thought the plaintiff could perform. *Id.* In this case, the VE identified positions with significantly higher numbers and provided adequate testimony to support her estimates.

Lucas suggests that VE testimony based on the DOT is unreliable because the DOT is obsolete. While the Seventh Circuit has criticized the DOT as being "obsolete," *see Spicher v. Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018), the court has not overturned an ALJ's denial of benefits solely on the basis that the VE used the DOT. Indeed, as recently as last year, the court accepted the DOT as a valid, and perhaps necessary, point of comparison for information provided by a VE. *See Surprise v. Saul*, 968 F.3d 658, 662 (7th Cir. 2020) ("Social Security Ruling ('SSR') 00-4p imposes an affirmative obligation on ALJs to ask vocational experts whether their testimony is consistent with the information in the DOT.").

Lucas also challenges the VE's testimony related to the use of SkillTRAN to obtain job estimate numbers. She further argues that the VE's methodology was not reliable because the VE could not name any place of employment where she had seen the jobs performed and she was unable to explain her methodology for reaching her job numbers. "In providing assessments, vocational experts may rely on publicly available sources as well as data developed through their own experiences and research." *Krell v. Saul*, 931 F.3d 582, 584 (7th Cir. 2019) (citation omitted). The VE explained that the SkillTRAN methodology was available online but briefly described that SkillTRAN used BLS data as its core data source, considered the current population survey, and applied a constant rate of change. R. 1212. The VE was not required to fully explain the methodology used by the SkillTRAN software because it was available online. It was enough for the VE to identify her sources and testify to their reliability. When asked about the reliability of the marker position, the VE testified that she had observed the marker position at a Dillard's department store. She explained that, even though she had not observed the job in the past year, the job was still relevant. R. 1210. The VE also testified that she relied on her education and experience to address the manual limitations, time off-task, and absenteeism issues not addressed by the DOT. R. 1216. That expertise, which was accepted by the SSA and Lucas, provides additional support as to the reliability of her testimony.

"Though the VE's description did not reveal the precise mechanics and statistical model involved, it nevertheless constitutes a 'reasoned and principled explanation,' at least by the low substantial evidence standard." *Bruno v. Saul*, 817 F. App'x 238, 243 (7th Cir. 2020) (citing *Chavez*, 895 F.3d at 970). Taken together, the VE's explanation of her methodology and her education and expertise constituted sufficient evidence to support the reliability of her testimony. *See Biestek*, 139 S. Ct. at 1154. Lucas also asserts that the jobs the VE cited were inconsistent with her RFC, but she has not shown that her social restrictions precluded her from performing the

21

unskilled jobs the VE cited.  In sum, the ALJ was entitled to rely on the VE's testimony in reaching her decision.

## CONCLUSION

For the foregoing reasons, the decision of the Commissioner is **AFFIRMED**. Lucas' motion for leave to file a response to Defendant's supplemental authority (Dkt. No. 35) is **GRANTED**.  The Clerk is directed to enter judgment in favor of the Commissioner.

**SO ORDERED** at Green Bay, Wisconsin this 30th day of September, 2021.

s/ William C. Griesbach
William C. Griesbach
United States District Judge